**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**Stephenson Equity Company, Plaintiff–Intervenor,**

v.

**CREDIT BANCORP, LTD., Credit Bancorp, Inc., Richard Jonathan Blech, Thomas Michael Rittweger and Douglas C. Brandon, Defendants.**

**No. 99 Civ. 11395(RWS).**

United States District Court, S.D. New York.

Jan. 19, 2001.

---

Securities and Exchange Commission, Salt Lake City, UT (Thomas M. Melton, of counsel), for plaintiff.

Securities and Exchange Commission, New York, NY (Robert Blackburn, of counsel), for Local Counsel.

Proskauer Rose, Los Angeles, CA (Richard Marmaro, of counsel), for Defendant R. Blech.

Milbank, Tweed, Hadley & McCloy, New York, NY (Andrew E. Tomback, of counsel), for Defendant T. Rittweger.

Getty, Keyser & Mayo, Lexington, KY (Richard A. Getty, of counsel), for Defendant D. Brandon.

Pattison & Flannery, New York, NY (Thomas R. Pattison, of counsel), for Third–Party Defendants.

Honorable Mary Jo White, United States Attorney for the Southern District of New York, New York, NY (Timothy J. Coleman, Assistant U.S. Attorney, of counsel), for Intervenor United States of America.

Wollmuth Maher & Deutsch, New York, NY (William A. Maher, Frederick R. Kessler, of counsel), Hall, Estill, Hardwick, Gable, Golden & Nelson, Tulsa, OK (Donald L. Kahl, T. Lane Wilson, of counsel), for Customer–Intervenor SECO.

Davis Polk & Wardwell, New York, NY (James H.R. Windels, Gary G. Lynch, Jonathan New, of counsel), for Intervenors Deutsche Bank Securities, Inc. and DB Alex. Brown LLC.

Sheldon A. Weiss, Mountainside, NJ, for Customer–Intervenors Stappas et al.

Hogan & Hartson, Washington, DC (E. Bartlett Prettyman, Jr., of counsel), for Customer–Intervenor Ray Trust.

Rosenman & Colin, New York, NY (Joel W. Sternman, of counsel), for Customer–Intervenor Robert Praegitzer.

Barger & Wolen, New York, NY (R. Steven Anderson, of counsel), Sutherland Asbill & Brennan, Atlanta, GA (Peter J. Anderson, of counsel), for Customer–Intervenor Centigram.

Makoff Kinnear Counsel, San Francisco, CA (Nancy Appel, of counsel), for Customer–Intervenor John Dillon.

Lambos' & Junge, New York, NY (Armand P. Mele, of counsel), for Customer–Intervenors S. Cole–Hatchard.

Kirkpatrick & Lockhart, Washington, DC (Richard J. Morvillo, of counsel), for Intervenor Ameritrade.

Morrison & Foerster, New York, NY (Carl H. Loewenson, Receiver and Fiscal Agent, of counsel), Dickstein Shapiro Morin & Oshinsky, New York, NY (Randy Paar, of counsel), for Receiver.

*OPINION*

SWEET, District Judge.

By letter dated January 12, 2001, Carl H. Loewenson, Jr., the court-appointed re-

ceiver (the "Receiver") in the above-entitled action, has submitted a revised proposed order for implementation of a partial plan of distribution for consideration by this Court.

In this Court's previous opinion of November 29, 2000 (the "November 29 Opinion"), approving the Receiver's proposed partial distribution plan (the "Compromise Plan"), with certain modifications, the Court expressed concern over the issue of customers whose assets are held in whole or in part with European financial institutions that do not presently recognize the Receiver's authority over those assets. *See SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2000 WL 1752979, at \*\*42–43 (S.D.N.Y. Nov. 29, 2000) ("The European holdings question is a troubling one given the uncertainties involved as to when, or even whether, the Receiver will obtain control over those assets .... [and] the vagaries of why a particular customer's assets may have ended up being held by a European institution as opposed to a domestic one."). Indeed, the Court recognized the harshness of this result, but noted that making some further provision for these customers was beset with practical difficulties. *See id.* Therefore, the Court directed the Receiver to consider whether any modifications to the Compromise Plan could ameliorate the situation for these customers, while still achieving a plan that is both equitable and practical. *See id.* at \*43. In addition, at a hearing on December 6, 2000, regarding the Compromise Plan, the Court directed that any interested party could submit additional material to the Court regarding this question.

The Receiver has recommended that the plan be modified to permit customers with securities deposited in accounts not under the Receiver's control to elect whether any or all of such securities should be treated as Attributed Unidentified Deposits, *i.e.,*

as "missing," within the meaning of the plan, and to receive a distribution accordingly. *See* Letter from Loewenson to the Court of December 20, 2000 (the "12/20/00 Loewenson Letter"); *see also Credit Bancorp*, 2000 WL 1752979 at \*31 (describing provision for distribution to customers whose securities are missing). Customers who make this election would relinquish all claims to those shares, and the Receiver would be entitled to sell them at such time as they come under his control. The Receiver has also provided information regarding the affected customers. *See* 12/20/00 Loewenson Letter at 5–6 and Exh. A. There are approximately twenty customers with securities held in European accounts, of whom ten have more than a third of their "shares claimed," as defined under the plan, in those accounts, including two for whom this figure is 100%, or essentially 100%.[1]

In order to fund a distribution based on treating the European assets as missing, the "Undertaking Percentage" contemplated by the plan must be increased. This reality was recognized by the Court in its previous opinion, although the amount of the increase required was not clear. *See Credit Bancorp*, 2000 WL 1752979, at \*43.

As explained by the Receiver in his current proposal, the amount by which this percentage must be increased and thus, the likelihood that the plan is actually feasible, depends upon whether all the affected customers choose to exercise this option. Indeed, not to put too fine a point on it, this issue hinges primarily on whether the largest Credit Bancorp customer, Stephenson Equity Company ("SECO"), elects to treat as missing that portion of its Shares Claimed that is held in European accounts. The reason for this is that the SECO shares represent approximately 81% of the value of the shares located in those accounts. *See* 12/20/00 Loewenson Letter at

---

**1.** Customer David E. Singleton ("Singleton") has 100% of his Shares Claimed located in foreign accounts. Customer Jeff Hoyak ("Hoyak") is shown as having 99.98% of his shares in foreign accounts because he also deposited just under $300 in cash with Credit Bancorp. All of his deposited shares are located in a foreign account.

2 and Exh. A. As of December 20, 2000, the Receiver estimated the Undertaking Percentage under the plan without the proposed modification as approximately 29.5%. The Receiver further estimated that if SECO were to treat its shares as missing, this percentage would increase to approximately 40%, while if only the non-SECO customers did so it would increase less dramatically, to approximately 31.5%. Finally, the Receiver has expressed the view that, given SECO's longstanding opposition to any plan involving the sale of its securities, it is unlikely that SECO would exercise the election option.

SECO has objected that the adverse impact of the proposed modification far outweighs any perceived hardship sought to be ameliorated or, to put it colloquially, that the Receiver proposes to kill a mosquito with a baseball bat. *See* Letter from Donald L. Kahl to the Court of December 20, 2000.[2] SECO focuses on the plight of Singleton and Hoyak, the two customers who have 100% of their assets located in European accounts, and contends that their hardship can . be addressed by the Receiver on an *ad hoc* basis. SECO also points out that the remaining customers would receive some distribution without the proposed modification, and avers that this distribution would be fair because these customers have significant assets located in domestic accounts. *See id.* at 2 and Attachment A. SECO warns that it may be unable to, or may choose not to, generate the additional funds required for its Undertaking Payment—including under a scenario where it elects not to treat its European shares as missing. Finally, SECO contends that the proposed modification is not equitable, and merely serves to shift the burden of financing an earlier distribution for customers with European assets onto, primarily, SECO. Instead, according to SECO, the fair solution would be to wait until the European assets come under the Receiver's control, or until the Receiver recovers additional funds through his third-party action against Certain Underwriters at Lloyds, *et al.* (the "Coverage Action").

The probability that a significant amount of time will elapse before the European assets come under the Receiver's control, if indeed he is successful in that effort, has been previously noted. Moreover, although it is hoped by the Receiver (and the customers) that the Coverage Action will indeed generate additional assets for the Receivership estate, whether and if the Receiver will prevail in the Coverage Action is speculative.

As this Court recognized in the November 29 Opinion, while the Compromise Plan is fair and equitable, some customers fare better under this plan, and some worse, than they would under other plans—including the SEC Plan, which the Court also considered to be equitable. *See* 2000 WL 1752979, at **36–37, **39–40. SECO, in particular, fares better under the Compromise Plan as compared with the SEC Plan because the Compromise Plan values claims based on the current market value of the securities, and provides for a mechanism whereby customers who wish to do so, like SECO, can recover their securities. *See id.* Meanwhile, if possible, customers such as the William Brewster Fiaccone Trust, the Lathrop Investment Trust, Vincent Bagli, and Stephen Robbins, who have between 43% and 63%, roughly, of their assets in European accounts, and others, should not be denied the opportunity for recovery at the same rate and at the same time as other customers simply because of the fortuity that some of their deposited shares ended up in foreign accounts. Finally, the Receiver maintains, reasonably, that the *ad hoc* "hardship" option is unrealistic because it still requires him to generate additional funds—and thus does not alleviate upward

---

**2.** SECO reiterated and further amplified its argument at a hearing on this matter on January 17, 2001.

pressure on the Undertaking Percentage—and because it would require such customers to obtain loans at market rates of interest, while other customers do not have to do so.

Therefore, under all the circumstances, it is fair and equitable to modify the Compromise Plan as proposed by the Receiver, and the revised proposed order regarding the distribution plan submitted by the Receiver will be approved.[3]

It is so ordered.

---

**3.** This revised proposed order also contains other modifications from the original proposed order submitted by the Receiver. These modifications, however, simply reflect the November 29 Opinion, and do not require discussion here.